GUYNN, et al. *v.* SHULTERS, et al.

GUYNN, et al. *v.* EVANS.

GUYNN, et al. *v.* HALTOM.

GUYNN, et al. *v.* FLETCHER.

GUYNN, et al. *v.* BATES.

GUYNN, et al. *v.* DAVIS.

Nos. 39348 through 39353 February 28, 1955 78 So. 2d 114

234

October 11, 1954 74 So. 2d 843

March 28, 1955 78 So. 2d 793

*J. D. Stennis, Jr.*, Biloxi; *Chas. S. Mitchell*, Pascagoula, for appellants.

*Karl Wiesenburg,* Pascagoula, for appellees.

238

ROBERDS, P. J.

These proceedings involve six separate suits by subscribers of the capital stock of Barton's, Incorporated, an Alabama corporation, to recover the price paid by complainants for such stock, with interest thereon from the dates of purchase.

On October 13, 1950, Earl S. Shulters, George E. Nelson and George D. Rigby filed a bill in the Chancery Court of Jackson County, Mississippi, against Mr. and Mrs. E. S. Barton, man and wife, Charles A. Guynn, Francis Watson, The Ingalls Shipbuilding Corporation and the Ingalls Employees' Credit Union. The cause was transferred to the Federal Court and then remanded to said chancery court. Two amended bills were filed by complainants. In brief they alleged they were induced to purchase the stock by Mr. and Mrs. Barton, Guynns and Watson, acting as dealers, or as agents of Barton's, Inc., and that neither said four individual defendants, nor Barton's, Inc., had complied with the requirements either of the Alabama or the Mississippi Blue Sky Laws, and that, under said laws and under the circumstances here involved, complainants had a right to rescind their purchases of the stock and recover from said four individual defendants and Barton's, Inc., the amount they paid therefor, with interest. These three complainants also alleged, as additional ground for recovery, that Mr. and Mrs. Barton and Guynn had made to complainants certain material false representations about the value of the stock, which induced them to subscribe therefor, and which rendered said three individuals liable to them for

the purchase price paid for the stock. We will refer to these three complainants as the Shulters group.

In May, 1951, John W. Evans, Joiner M. Haltom, Hugh Fletcher, Thomas M. Bates and E. B. Davis filed separate declarations in the Circuit Court of Jackson County, Mississippi, against Guynn and Mr. and Mrs. Barton, seeking to recover of said three defendants the purchase price the plaintiffs had paid for stock in Barton's, Inc., with interest from the dates of purchase. These cases were transferred to the chancery court of said county, where said five named plaintiffs filed separate bills in equity against said three defendants. The ground relied upon for recovery was noncompliance by Barton's, Inc., and by said three defendants, with the Blue Sky Laws of Alabama and Mississippi. These five complainants did not ground their right of recovery on false representations of said three defendants inducing complainants to subscribe for the stock. We will refer to said five complainants as the Evans group.

Barton, Guynn and Mrs. Barton, the only appellants here, in their answers to both groups, admitted that neither Barton's, Inc., nor they, had complied with the Blue Sky Law requirements either of Alabama or Mississippi. But, as a defense to all of the suits, they averred (1) that no defendant was a dealer within the meaning of the Blue Sky Laws; (2) that Barton's was not an investment company engaged in the sale of securities under said Blue Sky Laws; (3) they averred that Barton's was a closed corporation to which said laws had no application; (4) that both groups had participated in the operation of the corporation after it came into being, all as stockholders, and most as officers thereof, and they were estopped to base suits upon the grounds asserted in the bills, and (5) that both groups were subscribers to stock of a corporation yet to be formed, which later they incorporated themselves, and that the Blue Sky Laws are not applicable to stockholders who agree to subscribe to

the original stock of a corporation not in esse and which said stockholders later incorporate and bring into being.

In the suit of the Shulters group, the Shipbuilding Corporation and the Credit Union were made defendants to the bill as garnishees; Watson was a nominal party, and no service of process was had upon Barton's, Inc., and it did not appear. The final decree imposed no liability against the Credit Union, Barton's or Watson. It did adjudicate the Shipyards indebted to Guynn is an amount less than $200.00. No appeal was taken by any one of the four respondents just mentioned. They are not before this Court.

The final decree imposed personal liability against Barton, Guynn and Mrs. Barton for the price paid by all complainants for their stock, plus legal interest from dates of purchase to date of the decree. These three appeal to this Court. We will call them appellants except where mentioned individually.

By agreement all of the causes were heard and decided together in the lower court, and they are so considered and disposed of here.

■■ ■ We have concluded that the complainants (by which term we include both groups) cannot ground their suits on the Alabama Law. The chancellor found that the purchases of the stock by complainants were made in Mississippi. He had sufficient testimony to support the finding. ■■ ■ In addition to that, it is not disputed that whatever defendants said or did with reference to purchase by complainants of subscriptions to the stock was done and said without any pay or compensation whatsoever, and under the Alabama Act there is no personal liability on a solicitor under such circumstances. Sec. 5 (7), Title 53, Code of Ala. 1940.

And, since the Mississippi Law is applicable to the transactions here involved, we are confronted at the threshold with the question of whether or not our Blue Sky Law applies to organizers of a corporation who, as

a preliminary to the incorporation, agree to subscribe to the stock thereof, and who later organize and bring the corporation into being. A clearer picture, throwing light upon the question, will be revealed by a brief chronological summary of the events here involved.

On and prior to January 27, 1950, Mrs. Barton owned and operated a small chicken business at her home in' Grand Bay, Alabama, some twenty-six miles from Pascagoula, Mississippi. The business had prospered. However, on that date she and Mr. Barton owned, and she operated, upon the premises of Ingalls Shipbuilding Corporation at Pascagoula, Mississippi, a cafeteria for use mainly by the employees of that corporation. Her duties at the cafeteria consumed her time. On said date she sold to her husband E. S. Barton and to Charles A. Guynn, as equal partners, the chicken business. The purchasers took charge of the business, although Mrs. Barton continued to assist in the operations as her duties at the cafeteria permitted.

On or about April 25, 1950, a Mr. Levine, engaged in the purchase and sale of poultry in Biloxi, Mississippi, suggested to Guynn that they should incorporate and enlarge their business, indicating he would purchase the output thereof. Guynn was a plant engineer at Ingalls. He discussed the question with some of the other employees of Ingalls, including, perhaps, all of the complainants, and, according to complainants, or some of them, suggested it would be a good investment. Reference will be made later to just what was said. These discussions were had the latter part of April. On April 26th Barton and Guynn and Mr. Hill, an attorney, met at the cafeteria, and Guynn presented to them a list of the prospective stock purchasers. Hill was asked to prepare incorporation papers. Several of the prospective stock subscribers met at the Barton residence in Grand Bay the night of April 27th and discussed the desirability of purchasing stock and organizing the corporation. It is

not entirely clear from the testimony who of the complainants were present. However, it is shown that Haltom, Bates and Fletcher were at the meeting.

From April 26th to May 2nd a number of complainants, if not all of them, made inspections of the Barton-Guynn chicken farm. It might be added here that some eight to ten others, in addition to complainants, were interested and finally subscribed for stock.

On the night of May 2nd another meeting was held at the Barton residence. Mr. Hill had prepared, and he presented to the meeting, a form for signature by those who desired to subscribe for stock. The form is headed "Subscription List," and obligates the signers to subscribe for the number of shares and amount of stock set opposite their names in a corporation to be created with a capital stock of $25,000.00 under the name "Barton's, Incorporated." The form is headed Pascagoula, Jackson County, Mississippi, and the subscribers were to pay $100 per share. The subscription list in the record, used at that meeting, appears to bear the signatures of all complainants except Fletcher, although there is some question as to whether all signed on that occasion. At that meeting it was decided to incorporate. It was part of the agreement and understanding that Barton and Guynn would convey to the corporation, after incorporation, all of their stock of chickens, equipment, etc., at an agreed price of $8,100, and that Barton and Guynn, upon such conveyance, should be issued each forty shares of stock and Watson (who had been auditor of the business of Barton and Guynn) should be issued one share. Mr. Hill had also prepared the charter of incorporation. The charter showed Barton, Guynn and Watson as the incorporators. It also showed the agreement of Barton and Guynn to convey their business to the corporation and receive therefor stock as above indicated. It set out the amount of capital stock, price per share, etc. The meeting instructed Barton, Guynn and Watson (who was a

resident of Mobile) to proceed to procure the charter. The domicile was to be at Grand Bay. Mr. Hill proceeded to Mobile and obtained the charter. It is dated May 3, 1950, but was filed for record May 5th. The domicile is Grand Bay, Alabama; the capital $25,000, divided into 250 shares of common stock, at $100 per share. Barton is President, Guynn Secretary and Watson Treasurer, and they were named as incorporators and directors, and Guynn is designated agent to "receive" subscriptions to the capital stock. The agreement of Barton and Guynn to convey to the corporation the chicken enterprise was made a part of the charter; whereupon Barton and Guynn were to be issued each forty shares of stock and Watson one share.

The first meeting of the stockholders, after incorporation, was held at Barton's at 6 o'clock P. M. May 12, 1950. The minutes recite "the first meeting of the incorporators and the stockholders and subscribers to its capital stock of Barton's, Incorporated, was held at the office of the corporation at the home of Everett S. Barton, Grand Bay, Mobile County, Alabama * * *." The minutes disclose that all of the complainants were present except Shulters and Rigby. The minutes also recite that "The Certificate of Incorporation of BARTON'S, INCORPORATED, an Alabama corporation, was exhibited and on motion duly made and carried, said certificate of incorporation was accepted." A committee was appointed to draft bylaws. Haltom and Fletcher were on that committee. Provision was made for four additional directors to be elected. Haltom, Nelson and Bates were elected directors. The directors were authorized to acquire the assets of Barton and Guynn as theretofore agreed and as provided for in the charter. The minutes then recite "on motion duly made and carried, the acts and deeds of the three incorporators done in the name of the corporation prior to this meeting are hereby ratified and approved."

Following the foregoing meeting of the stockholders a directors' meeting was held at which Haltom, Nelson and Bates were present. Haltom was elected vice president of the corporation, the form of stock certificate was approved, and various other matters passed upon.

Three of the complainant stock subscribers paid for their stock May 12th; four paid on May 15th; one May 31st; two June 1st and one June 10th. The stock certificates to complainants were issued June 29th; those to Barton, Guynn and Watson were issued July 13th, after Barton and Guynn had conveyed to the corporation the assets they agreed to convey.

From the date of the issuance of the charter to October, when the Shulters group instituted this litigation, many stockholders' and directors' meetings were had. Various matters were passed upon at these meetings. We deem it unnecessary to detail them, except to mention an unaccepted offer of Barton and Guynn, made in September, to assume the debts of the corporation and pay the other stockholders par for their stock, executing promissory notes therefor. It appears, as best we can determine, that the attendance of complainants upon these meetings were as follows: Rigby attended at least one stockholders meeting; Fletcher was present at four meetings of the stockholders; Evans was present at five meetings of the stockholders and one of the directors; Nelson attended five meetings of the stockholders and five of the directors; Davis was present at seven meetings of the stockholders; Shulters attended five stockholders and twelve directors meetings; Haltom was present at five meetings of the stockholders and at eleven meetings of the directors and Bates attended five meetings of the stockholders and fourteen meetings of the directors.

The latter part of July, 1950, a disease, designated in the record as pullorum, infected the chickens, killing some fourteen thousand of them. At a meeting held

August 3rd, the Treasurer reported that after the loss of · chickens by pullorum the inventory showed 62,000 chickens on hand. It appears that the business was losing money. The manager operating the business was discharged and another engaged but the enterprise continued to operate at a loss until the· time the Shulters group filed the bill herein October 13, 1950.

 ██ The question now recurs whether these pre-organization stock subscribers, who afterwards procured a charter for and organized the corporation, as above shown, are within the provisions of the Blue Sky Law of Mississippi. While the authorities are divided upon the question, being controlled largely by statutes of the various states, we think the better rule is that pre-organization stock subscribers, under the circumstances here disclosed, have no right of action for failure of the corporation, or one who induces them to purchase stock, to comply with the Blue Sky Laws of Mississippi. The following cases announce holdings and principles sustaining that position: McWhirter v. Holmes, 176 S. E. 153 (Ga.); Wilder Nat. Tavern System v. Jillison, 240 N. W. 6 (Mich.), (The Michigan statute seems to have been later amended; Teran v. Hall, 47 S. W. 2d 79); Planters Warehouse Company v. Sentelle, 255 S. W. 589 (Tenn.); Strong v. Efficiency Apartment Corporation, 17 S. W. 2d 1, (Tenn.); Watkins v. Public Service Life, Health & Accident Company, 62 Pac. 2d 464 (Wash.); Gannon v. Grayson Water Company, 254 Ky. 251, 71 S. W. 2d 433; Kay v. Sunbeam Quarries Company, 258 Ky. 190, 79 S. W. 2d 700; Blomgreen v. Cowley, 282 Ill. App. 166.

In Watkins v. Public Service Life, etc., supra, the Court said: ''Here, the respondent's services were rendered as a step in the creation or organization of a corporation. He procured subscriptions to the capital stock, * * * His services were all rendered prior to the time that the prospective corporation could legally issue securities, the sale and disposition of which would be regu-

lated by the Securities Act." In Gannon v. Grayson Water Co., supra, the Court said: "Though the Act provides that 'security' shall include 'preorganization subscriptions,' it is at once apparent that when subscriptions are taken prior to the filing of articles of incorporation, no method is provided for the registration of such subscriptions."

In Fletcher, Cyclopedia Corporations, Vol. 14, p. 192, Sec. 6747, it is said: "Subscriptions to stock are to be distinguished from sales of stock by a corporation," and after noting that subscriptions to stock are within the Blue Sky Laws of some states, by virtue of statutes, then observes "But in other states the statute does not apply to a subscription to stock made before the corporation is created, or at least not to subscriptions by one interested in the promotion of the corporation."

All of the negotiations between appellants and complainants with reference to agreements to subscribe for stock were prior to formation of the corporation and had for their purpose the later creation of a corporation and purchase of stock therein by the parties. They were not forming themselves into an association or partnership or organization. They were individual preorganization subscribers for the purpose of creating and financing a corporation to be created at some time in the future. Under these circumstances, neither the contemplated corporation, not yet in being, nor the solicitors for subscriptions to stock of such nonexisting corporation, could have, in the very nature of the case, complied with the Blue Sky Laws of Mississippi at the time negotiations were being had between the parties hereto for subscriptions to the stock of such to-be created corporation.

As to the corporation itself, the statute requires that before selling, or offering for sale, its stock, bonds or other securities, the corporation, foreign or domestic, (referred to as an investment company) shall file in the office of the Secretary of State a statement showing in

full and in detail the plan upon which it proposes to sell such stock, securities, etc., and a copy of all contracts, stocks, bonds, etc., which it proposes to sell to customers, together with a copy of its prospectus, and of the proposed advertisements and literature to be used in connection with its sale of stocks, bonds * * *, etc., "which statement shall also show the name and location of the main office of the investment company, the name and address of its directors and officers, and an itemized account of its assets and liabilities and of its financial condition, and such other information touching its condition and affairs as the Secretary of State may require." Sec. 5362, Miss. Code 1942.

A graduated fee must be paid, and a resident attorney for process must be appointed. Secs. 5363 and 5364, said Code. The Secretary of State has the power to require additional information and may, at the expense of the corporation, have an audit made of the affairs of the applicant, and may require its stocks and securities to be placed in escrow. Before issuing his permit for the sale of stocks and securities, he must require of the applicant execution of a bond in a sum not exceeding one hundred thousand dollars, (Sec. 5367, Code of 1942) on which suit may be brought. Sec. 5368. Other sections provide for cancellation of permits by the Secretary of State.

It is at once evident that Barton's, Inc., not yet in existence, could not have complied with the foregoing requirements as a prerequisite to the preorganization negotiations to subscribe for future stock of the corporation when and if formed. Nor could Barton, Guynn or Mrs. Barton, at the time of such negotiations, have complied with the requirements of the Blue Sky Law of Mississippi applicable to dealers or agents or brokers (and the solicitor had to be one or the other) in procuring subscriptions to the stock of a corporation.

Section 5375, said Code, prohibits the sale in this State by any "dealer," of any stocks or other securities until

the Secretary of State has approved and issued his permit for such sale. Nor shall it be lawful for such dealer or investment company to transact business on any plan other than that set forth in documents and papers required to be filed by said section unless the changed method and plans have been approved by the Secretary of State. And Sec. 5376, said Code, forbids any dealer selling, or offering for sale, in this State, the stocks and securities of any investment company not complying with the statutes prescribing the conditions for doing business in Mississippi, unless such dealer has procured from the Secretary of State the permission which the investment company should have obtained. Again, it is perfectly evident that no one endeavoring to obtain subscriptions to stock of a future corporation could possibly comply with the requirements of the foregoing statutes.

We think this matter must be viewed in a practical way. Men in all parts of this State get together, in varying numbers, and discuss the prospects of successful operation of a corporation they propose to form and the advantage to them of investing in its stock if and when it is created. Some are enthusiastic; others are not. The enthusiasm of some overcomes the indifference of others and they all agree to subscribe for stock in the future corporation. Later the charter is obtained and the corporation created and organized by these very subscribers and the stock is issued. Either from mismanagement, or lack of demand for its output, or misfortune (as here, where 14,000 chickens died from disease), or for other reasons, the corporate business is not a success. Can one subscriber recover from a fellow subscriber the price he pays for his stock simply because the prospective corporation, and the enthusiastic subscriber, have not complied with the requirements of the Blue Sky Laws as above set out? We do not think that law was intended to apply to such a situation. It was as much the duty of one subscriber as that of another to see that the corporation

complied with the law. However, had the corporation, or appellants, complied with the Blue Sky Law such compliance would have occurred after complainants had agreed to subscribe to the stock. There had been no violation of law, or failure to comply therewith, when complainants subscribed to the stock. This was not a case of one engaging in the sale of stock of an existing corporation. Here all agreed to take stock for the very purpose of forming the corporation.

 There is another reason why the Blue Sky Laws are not applicable here. The statutes, in designating those within its terms, describe them as agents or dealers. Neither of appellants was an agent or dealer within those statutes. Section 5361, said Code, defines an agent as one who sells, negotiates or offers for sale, any security "for a compensation." It is not contended that appellants were to receive any compensation for anything they said or did about obtaining stock subscriptions.

Said Sec. 5361, said Code, defines a dealer as every person or company, other than an agent, who shall, in this State, " * * * engage either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, otherwise dealing in any security issued by others, or of underwriting any issue of such securities, or offering them for sale to the public." 53 C. J. S., p. 757, Sec. 74, defines a dealer as " * * * one, not an issuer, who as a business sells or offers for sale securities issued by an 'investment company,' a person or company engaged in the business of selling securities or offering securities for sale * * *." Again, that authority says "In the absence of a statute specifically so providing, the performance of a single act, or even a number of isolated acts, pertaining to a particular business or occupation does not constitute engaging in, or carrying on, such business or occupation within the meaning of the law imposing a license or tax thereon, unless the intent to engage in the business is clearly

apparent.'' The words of the statute convey the meaning, first, that the acts are part of the business of the dealer, and, second, that the acts are continuous. These ideas are reinforced by requirements of other sections of the Blue Sky Law, such as the necessity of obtaining a permit to conduct the business of a dealer. Appellants were not engaged in the business of selling securities. Barton was an employee at Keesler Field, and Guynn was an employee of the Shipyards. Mrs. Barton ran the cafeteria at the Shipyards. It is not shown that they ever engaged in the sale of any securities other than the part they took in the subscriptions here involved. These stock subscription transactions were purely incidental. They constituted no part of the business in which the appellants were engaged.

But the Shulters group, in addition to invoking noncompliance with the Blue Sky Laws on the part of Barton's, Inc., and the appellants, charged that they were induced to subscribe for stock by false and fraudulent representations of material facts by appellants, rendering appellants liable to that group for the price paid for their stock. We will consider the contentions and proof of the three separately.

First, as to the claim of Rigby: We will give a summary of his testimony and accept it as the facts of the case. He was a machinery supervisor at the Shipyards. He had not met Mrs. Barton when he subscribed for the stock. He knew who she was. He did not know Mr. Barton until after he subscribed. Neither ever talked with him about buying stock. John W. Evans, one of the complainants, first mentioned the matter to him. Evans said it was a beautiful chicken farm. Guynn talked to him once or twice after his conversation with Evans. He was asked to relate what Guynn said and this was his answer: ''It all happened in that one week, I would say, might have been Tuesday or Wednesday. He told me how the business was going, then he come back that same

week on Friday this time. He came in and told me if I wanted the stock I had better get it, they had people they were selling the chickens to in Mobile and they wanted the stock, and I said 'Well, I'll take the stock, Charley.'" Again he was asked to relate the statement made to him by Guynn and he said "Guynn was always telling me how good it was." He was asked "Did he make any other statement about the operation of the corporation?" He answered, "Not at that time." He then gave the check to Guynn, payable to the corporation, for $500.00. The remainder of his conversation with Guynn appears to have taken place after he subscribed and paid for the stock. He said he then informed Guynn he had heard the corporation was badly in debt, and that Guynn said they were not; that what they needed was some feed for the chickens and that they were going to ship eight thousand chickens to Mobile and would get cash for them. Later, in his examination, he was asked "Prior to you paying the $500.00, did Mr. Guynn describe to you the financial structure of the corporation?" He replied "No more than they had 80,000 chickens." Finally, he summed up his direct testimony in these words: "He (Guynn) never told me anything about the finances no more than they needed money for feed, and as soon as they sold 80,000 chickens they would be on easy street. Q. And that is all you know about it? A. Yes, sir."

It will be noted that this man doesn't claim that Mr. or Mrs. Barton ever said a word to him about subscribing for stock. They are out of his case. Now, as to the liability of Guynn, a part of what he said was simply an expression of opinion or his statements related to the future. There is no contradiction of his statement that Barton and Guynn were selling chickens to people in Mobile nor is it shown here that they did not have 80,000 chickens. In addition, it is evident that Rigby did not

rely solely on what Guynn said to him. He was influenced largely by what his friend Evans told him.

■■■ Years ago this Court set forth the essentials of false and fraudulent statements to set aside a purchase of stock. Selma, Marion & Memphis Railroad Company v. Anderson, 51 Miss. 829. The Court in that case said: "To escape from a subscription on this ground, several things must concur. It must be shown that the statement was not uttered as an opinion, but as an ascertained and existing fact. It must not only be false in fact, but must be also either known to be so by the party uttering it, or his position must be one that made it his duty to know the truth. The resisting subscriber must show that he acted upon such statement; that his own position was such as warranted him in so acting, and that the statement was as to a fact material to the question of his subscription." The Court further said: "To hold that every description to an inchoate undertaking like this can be avoided, because some enthusiastic or reckless agent has boasted of its resources or prophesied its speedy completion, would be to nullify, perhaps, a majority of such contracts." See also White v. Stewart, 166 Miss. 694, 145 So. 747. It is evident, in our opinion, that Rigby, under the proof and the rules of law applicable thereto, has no grounds for setting aside his stock purchase and holding Guynn liable for the price of the stock.

■■■ Now, as to Shulters: We quote and adopt as a basis for our conclusion a summary of his testimony made in the brief of his able counsel as to false and fraudulent statements and who made them. "Earl L. Shulters testified that he lived in the City of Pascagoula and was employed by the Maritime Commission as an inspector in the Ingalls Shipyard. That he knew both Guynn, the maintenance superintendent at Ingalls, and Mrs. E. S. Barton, who ran the Ingalls cafeteria. That in late March or early April Mrs. Barton, while appellee

and Earl Hammett were eating in her cafeteria, tried to interest appellee and Earl Hammett in investing in a poultry enterprise in Grand Bay, Alabama, with a view to getting appellee to invest in it. That she stated that the chicken enterprise 'was a successful enterprise,' 'going to be a million dollar proposition' 'with 80,000 chickens by the week production capacity.' Around the 1st of May he went out to look at the chicken farm, and decided to invest in it. He told Mrs. Barton that he would put some money in it. The appellant, Guynn, came by the office of appellee, on March 15, 1950, in the Ingalls Shipyard with a subscription list, and appellee subscribed for 20 shares, giving Guynn a check for $2,000.00, and receiving a receipt similar to that received by Rigby.'' We might add that Shulters inspected the chicken farm and said it looked good to him. He recommended the purchase of stock to Miss Baum. He carried her to see the chicken farm and both were favorably impressed with it. Miss Baum, on his recommendation, subscribed for stock to the amount of $1,000.00. Later this stock was transferred to Shulters. Shulters said he decided to invest ''After I had seen the place.'' He said that the disease of pullorum fell upon the chickens and that the report of State College showed that 27,711 chickens had died. Thus it is seen that he never talked with Barton about subscribing for stock and never talked with Guynn about that until after he had decided to invest in the enterprise. Mrs. Barton had no connection whatever with Barton's, Inc., nor did she have any financial interest in the partnership of Barton and Guynn. The only statement of existing fact made by her was that the chicken business of Barton and Guynn ''was a successful enterprise.'' That expresses a relative term. People differ as to what is meant by ''a successful enterprise.'' As a matter of fact the record discloses that the business had been very successful and made money to the time it was purchased by Barton and Guynn, and the record

fails to disclose it was not reasonably successful thereafter while operated by said purchasers. Her other statements were expressions of belief and hope in the future. But the foregoing evidence clearly shows that Shulters did not subscribe for stock because of what Mrs. Barton said. He subscribed after he had made visits to the place of business and had inspected it. Previously, in this opinion, we have described the extensive participation and activities of Shulters as a stockholder and director in the corporation after it was formed. We are unable to see any basis for holding appellants liable to Shulters.

■■■ Now, as to the claim of Nelson: He was an employee of the United States Marine Administration stationed at Ingalls Shipyards. He was an assistant to Shulters. He first met Mrs. Barton at the cafeteria. "Mrs. Barton and various other people in Pascagoula discussed the chicken farm at breakfast. The way we received it was a growing proposition starting from a small amount to a big amount and it looked good as an enterprise." He discussed the matter with Guynn; that "He (Guynn) said it was a growing proposition—no reason why it wouldn't be a growing proposition; they were going to get a special type of coops, and then said he was aking me if I wished to buy some stock in it, and I said all right." On cross-examination, he said Mrs. Barton was proud of the growth of the enterprise; that he went to the place of business and inspected the chickens and equipment. He said that quite a number of people discussed the business while eating their meals at the cafeteria, and that the discussion was all favorable. He then said "I wouldn't have bought my stock if they were not." He then said he "Discussed it with Mrs. Barton, the discussions were in general as we eat breakfast in the cafeteria. We talked about things in general; the shipyard along with the chicken business." Thus it is seen that this man never talked with Barton at all

about subscribing for stock. No recovery could be had against Barton. As to Mrs. Barton, she was proud of the business; that it started from a small business and had grown "to a big amount and it looked good as an enterprise." As a matter of fact the proof discloses the business had grown considerably — whether to a "big amount" might evoke differences of opinion, depending on each person's view of what was a "big amount." Guynn said he thought it would be a growing proposition. That was an opinion to be justified or not in the future, and the statement that they were going to get "a special type of coops," was an expression of future purpose, and whether carrying out such purpose would be to the betterment or detriment of the business is not shown. These statements are vague, indefinite and uncertain. They fall far short of proving false and fraudulent statements of existing material facts, which complainants must do to ground their right of recovery thereon.

Complainants urge that Guynn, with the approval of Barton, pledged 13,720 chickens as security for a loan of $3,000.00 made to Guynn April 25, 1950, by Ingalls Employees Credit Union, which fact was not disclosed to them, and that, for that reason, they have the right to rescind their stock purchases and recover from Barton and Guynn the price paid by them for their stock. The contention deserves serious consideration. It is a fact the loan was made and the proof does not establish that complainants knew of it except as to Bates and Evans, who were directors of the Credit Union and passed upon the loan, and Haltom, who was the Secretary-Treasurer thereof. However, we do not think the contention is well taken under the circumstances of this case.

The proceeds of the loan were used in and about the chicken business then being operated by Barton and Guynn and which later was to be, and was, conveyed to the corporation.

In addition it is shown, without dispute, that the Credit Union had no authority or power to lend money upon chickens, and that the purported pledge was not legally binding. Too, it is seen from the note that the chickens were described as "Secured by 13,720 chickens." Nothing is said about the owner or the location of the chickens. The description appears to be indefinite and void. Also the proof shows that while the quoted phrase was written into the note, the real security was an agreement in the note that a certain amount of the monthly pay due Guynn as an employee of Ingalls Shipyards should be applied each month to liquidation of the debt. This had been done and at the date of the trial the debt had been reduced to about $1,400.00. All of the chickens of the Barton and Guynn partnership, including these, were conveyed to Barton's, Inc., as agreed, and apparently all had been consumed in the operation of the corporate business before the trial was had herein. In other words, it is not shown that Barton's, Inc., or complainants, suffered any financial loss whatever as a result of this chicken transaction. We do not think the contention in this regard is well taken.

In passing on the contention of fraud, we have assumed, but have not adjudicated, that if fraud had been shown of such type as to justify recovery, that appellants would have been personally liable to the group relying thereon. We simply hold that if personal liability could legally attach to appellants, the proof here is insufficient to establish and impose such liability.

Reversed and bills of all complainants dismissed.

*Kyle, Arrington, Ethridge* and *Gillespie, JJ.,* concur.

ON MOTION FOR ADDITIONAL TIME FOR FILING OF
ASSIGNMENT OF ERRORS AND BRIEFS

PER CURIAM:

In connection with the above styled motion it has been stipulated in writing by counsel for appellants and counsel for appellees that the counsel for the appellants may have at least thirty days additional time in which to file their assignment of errors and brief in this cause, and also in Causes Nos. 39,349, 39,350, 39,351, 39,352 and 39,353, and that the appellees may have at least thirty days thereafter in which to answer the brief of the appellants, at the discretion of this Court. ██ We have concluded that the passing of these cases from their regular setting for November 1, 1954, and for a sufficient time to permit briefs to be filed in accordance with the agreement of counsel should not be granted. If we should sustain the motions of the appellants in these cases even though they are consented to by counsel for the appellees, it would result in the continuance of nearly one-half of the cases now set for hearing on Monday the 1st day of November, 1954, and the result would be that the five judges who would be sitting on that day would be left with an insufficient number of cases to engage their time during the following two weeks, before their next sitting; and the congestion of our docket for this term of the Court is, and will continue to be, such on account of the increase in the number of trial judges as not to justify the allowance of a continuance of a substantial portion of the cases set for any particular Monday, when to do so would result in the judges who are to sit on that particular Monday being left with an insufficient number of cases to engage their full time during the following two weeks.

When the Court reconvened on September 13 there were approximately 315 cases in the Clerk's office to be disposed of, which was at least 100 cases more than we had when we convened on the second Monday in Septem-

ber 1953 or 1952. We cannot get our docket reasonably current unless we have a sufficient number of cases submitted for decision on each Monday of the term. Of course, it sometimes occurs that there are exceptional circumstances which require the passing of a case to a later date than that on which it is originally set for hearing, but in the cases referred to in the motions now before us the reason assigned for allowing the appellants an additional thirty days within which to file their assignment of errors and brief is that the notice from the Clerk of this Court was not released to the counsel for the respective litigants until September 15, 1954. The purpose of that notice was to inform the attorneys on what day they should appear to argue their cases when oral argument is desired, and that the cases would be submitted without argument unless the attorneys appeared on the day mentioned in the notice and requested oral argument. The notice released by the Clerk on September 15, 1954, expressly stated that the assignment of errors and the appellants' brief was due no later than thirty days prior to the date a case is set for hearing, and that the appellees' reply brief should be filed no later than ten days prior to the setting of the case for hearing, and any rejoinder no later than three days prior thereto. But it is unnecessary that counsel should wait until they receive the notice from the Clerk as to when the case is set for hearing, before beginning the preparation of the assignment of errors and briefs. They are at liberty to do so when the appeal has been perfected and the transcript of the record has been made. It is the earnest desire of every member of the Court to accommodate the attorneys when they have conflicting engagements and are compelled under special circumstances to request that cases be passed, but the Court is not justified in permitting the continuance by stipulation of counsel of any substantial portion of the cases set for a particular day, when to do so will result in our own failure

to be able to assign to each judge a sufficient amount of work to engage his time and effort during the two-week period following the original setting of the cases on our docket.

The motions in each of the cases are therefore overruled with leave to counsel to agree among themselves as to the dates upon which they may file their respective briefs prior to November 1, 1954, when these cases are set for argument and submission, or submission without argument. If counsel for the appellants shall file their assignment of errors and brief in time for the appellee to reply prior to the date on which these cases are to be heard, the Court may in its discretion grant the appellant an additional three days or more subsequent to the submission of the case in which to file a reply to the brief of the appellees.

Motions overruled.

All Justices concur.

ON SUGGESTION OF ERROR

GILLESPIE, J.

It is not contended in the suggestion of error that the Court erred in holding that the transactions involved in these cases did not come within the provisions of the Blue Sky Laws of Mississippi or Alabama. It is contended that the Shulters group, that is, Shulters, Rigby and Nelson, believe that on another trial they could develop testimony that would enable them to come within the rule on the question of misrepresentation in connection with the sale of the stock. They do not make the claim that such additional evidence is available. Of course, there must be an end to litigation, and we would not be justified in remanding those cases merely to permit the named parties to make an effort to develop further proof that might or might not bring the cases within the applicable rule of law. We conclude, therefore, that there is no merit in the suggestion of error.

 While we have considered the suggestion of error on the merits, we order the brief thereon stricken from the files for the reason that it contains language showing disrespect for this Court. Language such as that used by the attorney in his suggestion of error and brief serve no purpose; it is of no aid to the Court and of no service to the clients in whose behalf it is used. This opinion is written for the purpose of admonishing counsel, and any others similarly disposed, to refrain from the use of language showing contempt or disrespect for the Courts. Attorneys perform an important and indispensable service in administering the laws. The duties of the court and the bar complement each other; neither can properly function without the other; and mutual respect is demanded by law and tradition. It is inherently within the power of the Court to enforce reasonable rules against disrespectful and contemptuous language directed to the Court, and we would be remiss in our obligation to the judicial department as an institution of government if we should ignore a violation of such rules.

"(4) Any suggestion of error containing language showing disrespect or contempt for this Court will be stricken from the files, and the Court will take such further action relative thereto as it may deem proper." Rule 14, Revised Rules of the Supreme Court of Mississippi, 1953.

What we have said is not to be construed to mean that attorneys may not criticize a decision of the Court. Anyone has a perfect right to criticize, but it must be done within the bounds of propriety.

Suggestion of error overruled, and brief thereon stricken from the files.

All Justices concur.